MABEL BOEHNKE et al., appellees, v. WALTER T. ROENFANZ et al., appellants.

No. 48544.

(Reported in 67 N.W.2d 585)

December 14, 1954.

Boyle & Schuler, of Clear Lake, for appellants.

B. C. Berge, of Garner, Linnan & Lynch, of Algona, and Hutchison, Hutchison, Owens & Carroll, of Algona, for appellees.

Oliver, J.—Each of the two plaintiffs seeks to have established an undivided two-ninths interest in a 610-acre farm in Hancock County, inherited from their father and transferred to their brother, defendant Walter T. Roenfanz, in trust for the payment of certain debts of their father's estate. Plaintiffs prayed also partition of the real estate and an accounting. The parties stipulated and the court ordered that the issue of ownership of the claimed interests in the land be first tried and other issues be reserved pending determination thereof. Upon trial

242

each plaintiff was adjudged the owner of a two-ninths interest in the farm. All defendants except plaintiffs' mother, Clara Roenfanz, have appealed.

Albert Roenfanz, of Clear Lake, Iowa, died intestate August 18, 1931. His heirs were his widow, Clara, who took one third of his estate, and their children, plaintiffs Mabel Boehnke and Alice H. (Boehnke) and defendant Walter, each of whom was entitled to two ninths. The widow, Clara, and son, Walter, were administrators of the estate. The estate was heavily indebted and some of its properties were lost by foreclosure.

Among the unsecured obligations was $30,838.85 owed First National Bank of Clear Lake. E. B. Stillman, attorney for administrators, was attorney for the bank and later was its conservator. The administrators arranged that the bank file no claim against the estate and its debt be secured by a mortgage to be placed on the 610-acre farm in Hancock County, here involved. November 7, 1932, when the time for filing claims had elapsed, plaintiffs Mabel and Alice were advised of this arrangement and were shown a trust agreement and certain other instruments which Mr. Stillman had prepared.

The trust agreement recites Albert's death, his heirs-at-law, and ownership of the 610-acre farm, the homestead in Clear Lake and a one-half interest in 306 spring pigs, 1 sow, 25 cows, 13 calves, 71 feeders, 300 bushels of corn, 4000 bushels of oats and 70 tons of hay. It states no claim was filed by the bank because Walter and Clara assumed the indebtedness owed it by deceased and that by arrangement among the heirs a $30,838.85 mortgage on the 610-acre farm was put up to secure the debt and the homestead also was to be held as security therefor. It then recites the plan to have the widow and daughters deed the real estate to Walter, take back a mortgage on the farm and assign the mortgage to the bank.

The instrument then states it is desirable that the farming enterprise on the farm be conducted in the same manner as it was prior to Albert's death, that is, Walter shall run the farming business, and manage such real estate on the same basis, and shall receive one half of the net proceeds, the other half to go to pay taxes and upkeep, and the remainder toward liquidating the debt

to the bank. The homestead is to be sold and the proceeds applied on the debt, and when the indebtedness is liquidated, all personal property will be sold, "and the real estate shall be reinvested in the heirs as though said mortgage and this instrument had not been drawn and executed", except that the estate owes Walter $7000, for which amount, with interest, he shall have a prior interest and lien. Walter and Clara are authorized to renew any estate debts assumed by them, the same to be secured by the mortgage, the homestead and the personal property.

Finally it is provided that at least once a year Walter "will give an accounting of the business and the affairs of the said real estate in the handling of the farm * * *."

This instrument was executed by Walter, the widow and the plaintiffs, November 7, 1932.

As a part of the transaction and the same time, the widow, Clara, Mabel and her husband, and Alice, then single, deeded the farm and the homestead to Walter. Walter executed to them his $30,838.85 note secured by mortgage on the farm and they assigned the same to the bank. All the instruments except the trust agreement were acknowledged and recorded.

Apparently the formal transfer to Walter of their undivided interest in the pigs, cows, feed, etc., listed in the trust agreement and kept on the farm, was overlooked on November 7. This transfer was made November 25 by a bill of sale to Walter executed by plaintiffs and Clara.

After the trust agreement was made Walter continued to operate the farm. He had been making partnership federal income tax returns with his father as partner. Until 1946 he continued to make partnership returns, listing his mother as his partner. He testified this was done on the advice of the person who prepared his income tax returns. Until sometime in 1940 he continued a bank account entitled, "A. Roenfanz estate." He testified: "I did divide it until the account was closed in 1940 and put half in my account and half in the estate account on the farm operations."

His two sons, defendants Earl and Harry Roenfanz, helped him operate the farm. He testified they have been his partners in such operation since 1945. He made none of the yearly accountings required by the trust agreement. In 1947 plaintiffs

asked for an accounting and settlement. Conversations followed for some years but no agreement was reached and this suit was instituted in October 1952.

The defendants are Walter, his wife, two sons, their wives, and Clara Roenfanz, the mother. Clara's answer stated she had relinquished her interest in the farm to Walter and disclaimed any interest adverse to him. She has not appealed.

I. A pleaded defense referred to in appellants' brief is that November 25, 1932, when plaintiffs and their mother gave Walter the bill of sale to their undivided interest in the livestock, grain and hay, the parties orally abrogated the trust agreement and it was orally agreed Walter was to be the absolute owner of all the real estate and personal property in consideration of the payment and discharge by him of all the indebtedness against the farm, and other debts of decedent, assumed by or owed to Walter, and his agreement to support and maintain the mother, Clara, during her lifetime. Plaintiffs testified no such oral agreement was ever made. It is not contended there was any formal cancellation of the trust agreement made November 7 or that the duplicates thereof held by plaintiffs and the other members of the family were called in or were endorsed or marked in any manner.

It is improbable that parties to a series of such carefully drawn instruments conveying and mortgaging real estate and establishing a trust therein would, at the time of executing the last of these, orally cancel the written trust agreement without any notation or written evidence of this action. The testimony of Walter himself on this point was contradictory. He testified: "And when this [bill of sale] was drawn up and signed, I felt as though I was the owner of the farm. I felt that the bill of sale to the personal property gave complete title to the farm." However, he testified later: "Yes, up until 1940 the farming operations were continued as they had been before. I would operate the farm, feed hogs and cattle, pay the expenses and divide the profits 50-50, 50% to me and 50% to the estate. Well, I guess when I told the court that since 1932 I was claiming to be the absolute and sole owner of the farm, it is not correct because I was dividing the profits, half to me and half to the estate."

The trial court held the evidence of the alleged oral agreement to give Walter the shares of the others in the real estate fell short of being clear, satisfactory and convincing, and that there was no such agreement. We concur in that holding and conclusion.

II. Appellants contend the action is barred by statutes of limitations, sections 614.1(6) and 614.17, Code of Iowa, 1954, and by laches and equitable estoppel and that Walter is the absolute owner of the land by adverse possession. Section 614.1-(6) provides an action for the recovery of real property must be commenced within ten years. Code section 614.17 provides no such action, based upon a claim antedating 1940, shall be maintained against the record titleholder in possession, when he and his grantors have held the record chain of title since January 1, 1940.

At the time the trust agreement was made the parties understood the bank wanted its money and that Walter would try to refinance the debt with a farm loan from some loan agency and would gradually retire the loan from the earning of the farm, in accordance with the trust agreement. Mr. Stillman testified it then appeared this would take a long time. Walter refinanced the indebtedness in 1934 with a $17,500 amortizing, 35-year loan from the Federal Land Bank, a $5000 ten year amortizing loan from the Land Bank Commissioner and $7000 he testified was advanced by his wife. Payment of one of the Land Bank mortgages was completed in 1937, the other in 1941.

Walter made no reports and gave no information to his sisters about the operations of the farm and his progress in paying the debts. He was their trusted elder brother who, upon their father's death, had assumed the management of the family affairs. They were on good terms with him and had confidence in him. One of them testified: "I expected it would require a long period of years to liquidate that indebtedness. I left the matter of an annual accounting up to Walter."

Alice Boehnke testified plaintiffs had at times discussed the question of an accounting but did not go to Walter. "We figured they [the mortgages] were not paid off." However, in 1947 they decided to ask him about the matter. They testified he at first

denied there was a trust agreement but soon found his copy of it. He told them he had no records from which he could make an accounting. They met with him a considerable number of times after that and their negotiations continued for some years.

One of the plaintiffs testified they were trying to arrive at a figure for an accounting and Walter was requesting them to fix the amount they would accept in settlement; at one time Walter said he would make whatever accounting he could from his records; they tried to work out a figure upon a rental basis; and that Walter thought their figures were unreasonable. Their last meeting was in the office of Walter's attorney in October 1952. Mabel testified she was then told they had no claim whatsoever under the statute of limitations and that was the first time she had any knowledge from any source that Walter was repudiating the trust. This suit was instituted a few days later.

Walter testified that when his sisters in 1947 spoke to him about settling he said, "There isn't anything to settle. It is my farm and why should I have to settle with you?" He agreed there were subsequent negotiations for settlement with plaintiffs, but testified: "I wanted to settle this in a Christian way. It was a family matter."

We have already held there was no oral agreement in 1932 to abrogate the written family trust agreement and give Walter ownership of the farm. There is no contention the trust agreement was thereafter the subject of discussion or correspondence between Walter and plaintiffs until 1947. It may be well to observe the case does not turn upon whether Walter repudiated the trust in 1947 or, as plaintiffs contend, in 1952.

It is elementary that as between the trustee and cestui que trust of an express trust, statutes of limitations have no application. Possession by the trustee of trust property is, in law, possession of the cestui que trust. As against an express and continuing trust, time does not run until repudiation or adverse possession by the trustee and knowledge or notice thereof to the cestui. Howes v. Sutton, 221 Iowa 1326, 1330, 268 N.W. 164, and citations; Zunkel v. Colson, 109 Iowa 695, 698, 81 N.W. 175; Rorem v. Rorem, 244 Iowa 980, 989, 59 N.W.2d 210, 215; 34 Am. Jur., Limitation of Actions, sections 107 and 175; 53 C. J. S., Limitations of Actions, section 19(a); 54 C. J. S., Lim-

itations of Actions, section 178; Bogert on Trusts and Trustees, section 951, pages 200 to 202.

█ Appellants contend Walter's failure to make an accounting in 1933 and thereafter, as required by the trust instrument, was a repudiation of the trust which set in motion statutes of limitations. This contention is not meritorious. The failure to account was a breach of the trust but it did not amount to a repudiation. The applicable rule is thus stated in England v. Winslow, 196 Cal. 260, 272, 274, 237 P. 542, 547, 548: "The only way in which the trustee of an express or voluntary trust can set the statute of limitations in operation in his favor with respect to it or its properties in his hands is by a distinct act of repudiation amounting to a denial of its existence, and no mere tacit failure of the trustee to perform his duty in respect to such trust could or should be held to amount to a repudiation of it so as to set the statute of limitations in motion in his favor and as a result of his own neglect of duty."

The decision states the rule that the statute of limitations is to be favored as a statute of repose, "has never been given application to voluntary trusts, since to do so would be to render such statute not a beneficent statute of repose but a vile instrument of wrong in relation to those who are standing and continuing in voluntarily assumed confidential relations to each other." See also 54 Am. Jur., Trusts, section 83; 65 C. J., Trusts, section 791.

█ The foregoing rules are applicable also to appellants' contention statutes of limitations were set in motion when Walter failed to reinvest title in plaintiffs after the bank mortgage was refinanced in 1934 or in any event after the refinancing mortgages were paid in 1941. Appellants do not stress the 1934 refinancing which, obviously, was merely a transfer of the debt, as expected by the parties to the trust agreement. Plaintiffs testified they had no knowledge until 1947 the indebtedness had been paid. In that connection it should be said the recording of the releases did not give plaintiffs constructive notice of such payments. Young v. Howard, 73 App. D. C. 340, 120 F.2d 712; Wagner v. Wagner, 240 Iowa 1113, 38 N.W.2d 609; Pels v. Stevens, 187 Iowa 443, 462, 173 N.W. 56, 63. They were not required to keep themselves informed of the status of the trust property by checking the records or otherwise investigating.

The trust in this case is somewhat unusual in that no calendar date or future event which would be known to plaintiffs was fixed for its termination. No one, save the trustee, would have personal knowledge of the time when all the indebtedness against the farm was paid, so that the trust could be terminated. The trust agreement required the trustee to give an accounting "at least once a year", "to the end that each one shall know and be familiar with the manner in which the affairs are being conducted."

As already pointed out, his failure to make these periodic reports was a breach but not a repudiation of the trust. When the debts were liquidated, his failure to make a complete report and to take steps to terminate the trust and reinvest plaintiffs' title in them was in violation of his duties as trustee. However, plaintiffs did not then know the purposes of the trust had been accomplished. Nor was there anything to excite their suspicions. They testified they thought the indebtedness had not yet been paid and relied upon Walter's fidelity in handling the trust. This they were entitled to do.

We hold the defense based upon statutes of limitations was not established.

III. We agree also with the conclusion of the trial court that the defense of adverse possession was not established. Walter's possession of the farm was referable to the trust agreement and was not adverse until the trust was repudiated and such repudiation was brought to the knowledge of plaintiffs.

IV. What has been said with reference to the claimed bar by statutes of limitations is, in general, applicable also to the pleaded defense of laches. Laches has been defined as such delay in enforcing one's rights as works a disadvantage to another. The trial court concluded that since the general statute of limitations had not run and there was not sufficient evidence of any hardship or detriment to Walter because of laches or acts of plaintiffs, and considering the relationship of brother and sisters, this was not a proper case for a court of equity to apply the doctrine of laches. We agree with this conclusion. Lutton v. Steng, 208 Iowa 1379, 227 N.W. 414; 54 Am. Jur., Trusts, section 580; Restatement of the Law, Trusts, 629,

630, section 219; 30 C. J. S., Equity, section 129; 19 Am. Jur., Equity, section 498 et seq.

V. The estoppel pleaded by defendants was based upon the conduct of plaintiffs in not objecting to the making of improvements upon the farm or expenditures by Walter, in reliance upon the alleged 1932 oral agreement the farm was his property. The evidence shows there was no such oral agreement. Moreover, part of the improvements and expenditures were made between 1932 and 1940 during which period Walter admittedly operated the farming enterprise on equal shares with the cestuis. Necessarily, this was under the trust. The evidence indicates plaintiffs did not interfere with or investigate the operation of the farming enterprise by Walter, the trustee, because he was their brother and they trusted him. Again, part of the improvements and expenditures were made after plaintiffs asked for an accounting in 1947. Walter then knew plaintiffs were claiming their share in the farm. There is no substantial proof upon which to base an estoppel.

The judgment of the trial court is affirmed.—Affirmed.

All JUSTICES concur.